# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Kimberly A. Miller,                            Civil No. 11-2070 (DWF/LIB)

        Plaintiff,

v.                                            **MEMORANDUM**
                                             **OPINION AND ORDER**

Benton County, Benton County
Sheriff's Office, and Brad Bennett,
in his capacity as Sheriff of
Benton County,

        Defendants.

---

Kenneth H. Fukuda, Esq., Lorenz F. Fee, Jr., Esq., and Sonia L. Miller-Van Ort, Esq., Sapientia Law Group, counsel for Plaintiffs.

Ann R. Goering, Esq., and Joseph J. Langel, Esq., Ratwik Roszak & Maloney, PA, counsel for Defendants.

---

## INTRODUCTION

This matter is before the Court on a Motion for Summary Judgment brought by Plaintiff Kimberly A. Miller ("Miller") (Doc. No. 26), and a Motion for Summary Judgment filed by Defendants Benton County, Benton County Sheriff's Office, and Brad Bennett in his capacity as Sheriff of Benton County (collectively "Defendants") (Doc. No. 21), in which Defendants request that the Court award summary judgment as to the employment discrimination claims brought against them by Miller. For the reasons set forth below, the Court denies both motions.

## BACKGROUND

In 2002, Miller was diagnosed with multiple sclerosis ("MS"), a neurological and immunological disorder. (Doc. No. 29, Miller-Van Oort Aff. ¶ 2, Ex. A; Doc. No. 24-2 (Miller Dep.) at 79.) Miller's MS caused her to experience symptoms including numbness and sensory problems in her limbs, chronic headaches, and widespread pain. (Miller-Van Oort Aff. ¶ 2, Ex. A.) She also suffered from low energy, problems with balance, and hot flashes. (*Id.*) The disorder was such that Miller would experience "exacerbations," where her symptoms would intensify for some time, and then abate. (*Id.*) These exacerbations were generally unpredictable in both timing and duration, but could last for several days or weeks. (Doc. No. 1, Compl. ¶ 38.) During these exacerbations, Miller suffered cognitive problems, difficulty walking, and challenges in caring for herself. (Miller-Van Oort Aff. ¶ 2, Ex. A.)

Prior to her 2002 diagnosis, Miller was hired by Benton County in July 1996 as a Detention Officer I, also known as a "Jailer." (*Id.* ¶ 3, Ex. B (Johnson Dep.) at 34-35.) Miller was promoted to Detention Officer II, or "Sergeant." (*Id.*)[1] At all relevant times, she was employed as Sergeant. (Comp. ¶ 36.) Miller received positive job reviews throughout her employment with Benton County. (Johnson Dep. at 67, 70-71.)

---

[1] Benton County Jail is a complex with a "secure perimeter." The Detention Officer II's office is contained within the secure perimeter, near the intake area. (Miller-Van Oort Aff. ¶ 10, Ex. I (Hackett Dep.) at 42.) Central Control, also contained within the secure area, is a "large glass enclosed area" with monitors allowing for observation of much of the jail. (*Id.* ¶ 8, Ex. G (Headley Dep.) at 48.)

Shortly after her diagnosis, Miller informed Jail Administrator Susan Johnson that she had MS. (*Id*. at 32-33, 59.) Miller and Johnson had been friends since college. (*Id*. at 32, 33, 59.) Johnson told the Sheriff (at the time, Sheriff McMahon) about Miller's MS diagnosis. (*Id*. at 60.) Johnson also notified her subordinate, Russ Hackett, who was Miller's immediate supervisor. (*Id*. at 61.)

A Sergeant's duties, as listed in the job description, include but are not limited to: training and supervising staff; supervising, transporting, and booking inmates; conducting security searches; and responding to jail emergencies such as fights, cell extractions, and medical crises. (Doc. No. 24-14, Def. Ex. 1; Miller-Van Oort Aff. ¶ 6, Ex. E.) Inmate contact is often necessary to perform these duties, and a Sergeant always carries a Taser. (Doc. 24-4 (Hackett Dep.) at 24-29.) In a February 21, 2008 job description questionnaire, Miller reported that 10% of her time was devoted to controlling aggressive inmates and responding to emergencies. (Doc. No. 24-52, Def. Ex. 43.)

Jailers are assigned to five posts on a rotating basis, including that of Central Control. (Johnson Dep. at 15-17, 148.)[2] Working in Central Control involves opening and closing doors in the facility, tracking staff and inmate movement via cameras stationed throughout the jail, and managing the radio during emergencies. (*Id*. at 16, 147-48.) Central Control is the "safety and security center of the jail." (*Id*. at 16.) Prior to July 2008 and solely at her discretion, Johnson would occasionally assign both Jailers

---

[2] An individual working in Central Control does not leave that post, even in an emergency. (Johnson Dep. at 75.)

and Sergeants, including Miller, to Central Control if they were injured or ill. (*Id*. at 62-63.) This informal practice was never approved by the Sheriff or formally authorized. (*Id*. at 163; Miller-Van Oort Aff. ¶ 9, Ex. H (Bennett Dep.) at 83.)

With respect to Miller, after her diagnosis, she was allowed to work the Central Control unit on occasion when she was not feeling well. (Hackett Dep. at 12; Miller Dep. at 46.) Johnson also acknowledged that Miller would operate the Central Control unit occasionally when she was experiencing a headache. (Johnson Dep. at 79.) Co-workers also testified that Miller worked in Central Control "quite a few times" when she was not feeling well. (Miller-Van Oort Aff. ¶ 7, Ex. F (Eull Dep.) at 52-53.)

Operating Central Control is not a listed job duty for Sergeants. Because at least one person must be stationed in Central Control at all times, a Sergeant would have to be relieved by a Jailer to respond to an emergency. (Miller Dep. at 56.) While Central Control allowed for one to view portions of the jail, several employees testified that the cameras do not show all areas of the jail, may be time-delayed, and do not provide audio. (Doc. No. 24-1, Vasser Aff. ¶ 5; Doc. No. 24-1, Zuwacki Aff. ¶ 5; Doc. No. 24-3 (Eull Dep.) at 40-41, 45.) Additionally, while Miller states that she was able to complete other job duties from Central Control, such as filling out paperwork, record evidence shows that this involved at least some level of distraction from viewing cameras and operating doors. (Miller Dep. at 48, 56, 72; Eull Dep. at 103-94, 122-23; Vasser Aff. ¶ 5.)

By July 2008, Miller's condition had deteriorated to the point that she asked at least one jailer to help perform her duties for her, such as inmate pat-downs and running to emergencies. ( Johnson Dep. at 52-54.) At times when Miller was the only Sergeant

4

on duty, employees testified that she would assign herself to Central Control and pass on her duties as Sergeant to one of the jailers. (Eull Dep. at 58-60, 104-05; Zuwacki Aff ¶ 7.)

On July 11, 2008, Sheriff Bennett issued a memo stating that Sergeants must perform the duties set forth in their job description. (Bennett Dep. at 93; Doc. No. 24-6 (Bennett Dep.) at 82-83.) Sheriff Bennett testified that the decision was made because Defendants did not want Sergeants working in Central Control. (*Id*. at 85.) The memo stated in pertinent part:

> This memo is written to clarify some information that was stated in an earlier memo dated July 10, 2008 from Lt. Hackett and Capt. Johnson.
> Effective immediately, it is the expectation that Sergeants perform the duties as stated in their job description (see attached). It is important to note that Central Control is not a regularly assigned duty for Sergeants. Sergeants should not be working in Central Control unless directed to do so by Jail Administration under special circumstances that may arise.
> If an employee is placed on restrictions from a physician, then those restrictions will be reviewed to see if there are any Sergeant duties that the employee can still perform. If there are no Sergeant duties that the employee can perform within restrictions, then the employee would not return to work until he or she is able to perform Sergeant duties.

(Doc. No. 24-22, Def. Ex. 13.)

On July 21, 2008, the Benton County's Sheriff's Office issued another short memo that read:

> Any employee light duty requests should be given to the employee's immediate supervisor. The supervisor shall then forward the request and any documentation from the doctor to the Sheriff or Chief Deputy for review. After reviewing the request the Sheriff or Chief Deputy will either approve or deny the request.

(Doc. No. 24-24, Def. Ex. 15.) On July 22, 2008, Miller provided a doctor's note requesting light duty for 2-3 weeks. (Doc. No. 24-26, Def. Ex. 16.)

On July 27, 2008, Miller sent a memo to Johnson and Bennett requesting the accommodation of being allowed to work from Central Control when experiencing an exacerbation, arguing that the new policy unreasonably prevented her from being able to work. (Doc. No. 24-26, Def. Ex. 17 (the "July 2008 Letter").) The letter reads in relevant part:

> I am writing to you today to <u>once again</u> request reasonable accommodations for my disability. Employers are required to provide reasonable accommodations to employees with disabilities according to the Americans with Disabilities Act and The Minnesota Human Rights Act. This reasonable accommodation that I am requesting is to be placed in Central Control when the affects [sic] of my disability warrant. The reasonable accommodation had been provided to me for several years previously, but for unknown reasons has been recently denied. The denial of previously afforded reasonable accommodations has caused me to miss several scheduled shifts that I would have otherwise worked . . . .

(*Id.* (emphasis in original).)

On July 31, 2008, Defendants' Human Resources Director, Tammy Bigelow, sent a letter and a Reasonable Accommodation Request Certification, along with a copy of Miller's job description, to Miller's doctor. (Doc. No. 24-30, Def. Ex. 21.) On August 7, 2008, Defendants received the form from Miller's doctor, which stated that Miller had

6

functional limitations that varied depending on her symptoms and that Miller was not to have contact with inmates when having an exacerbation. (Doc. No. 24-31, Def. Ex. 22.)[3]

On August 28, 2008, County Administrator Montgomery Headley sent a letter denying the request and reiterating the revised policy. (Miller-Van Oort Aff. ¶ 8, Ex. G (Headley Dep.) at 107; Doc. No. 24-33, Def. Ex. 24.)[4] On August 28, 2008. Headley met with Miller to review this letter to her. (Headley Dep. at 52.) In the letter, Miller was informed that her request for light duty in Central Control was denied because the "essential job functions [of a Detention Officer II] cannot be performed without inmate contact and cannot be performed from Central Control." (Def. Ex. 24.) Defendants also discussed the possibility of a transfer to another position. (*Id.*) No other accommodations were offered or discussed by either party. At some point, Defendants also offered Plaintiff an eight hour schedule instead of a twelve hour schedule. (Miller Dep. at 34; Johnson Dep. at 145.) Miller declined, as she wanted more days off. (*Id.*)

Beginning in May 2008 to the time of her termination, Miller's absences were increasingly common, and coworkers and other employees were often required to cover Miller's absences. (Miller Dep. at 39; Eull Dep. at 91; Johnson Dep. at 156-58.) By

---

[3] On August 22, 2008, Miller requested 30 days of intermittent leave because she was running low on FMLA hours. (Doc. No. 24-32, Def. Ex. 23.) Sheriff Bennett granted that request. (*Id.*; Bennett Dep. at 118.)

[4] At the time of this request, Tammy Bigelow, who would normally handle employment accommodation requests, was preparing to take maternity leave, so County Administrator Montgomery Headley ("Headley") took over that responsibility. (Miller-Van Oort Aff. ¶ 14, Ex. M (Bigelow Dep.) at 96.)

7

October 8, 2008, Miller had missed parts of or entire shifts fifteen out of sixteen days, such that Hackett and Johnson held a meeting with Miller to discuss the issue. (Doc. No. 24-35, Def. Ex. 26.) Miller acknowledged the challenges she was experiencing and asked the County Board for more intermittent leave. (*Id*.) This request was denied on October 22, 2008. (Doc. No. 24-37, Def. Ex. 28.).

In November 2008, Bigelow informed Miller that she had not worked sufficient hours to re-qualify for FMLA leave and that unpaid leave beyond the additional 30 days granted by Sheriff Bennett would be grounds for termination. (Doc. Nos. 24-38, 24-39, Def. Exs. 29, 30.) Miller filed an EEOC charge on November 21, 2008. (Doc. No. 24-44, Def. Ex. 35.) Having exhausted her supplemental 30-day leave on December 8, 2008, Miller received donated leave from coworkers that covered absences until January 9, 2009. (Doc. Nos. 24-42, 24-43, Def. Exs. 33, 34.) On January 9, 2009, Bigelow informed Miller that she had run out of leave and additional leave would not be approved. (Doc. No. 24-45, Def. Ex. 36.)

On February 8, 2009, Miller did not show up for work. Sheriff Bennett notified Miller that her termination was being considered, and she was temporarily placed on administrative leave. (Doc. No. 24-47, Def. Ex. 37.) Defendants specifically asked Miller to provide additional information about possible accommodations. (*Id*.) Miller was subsequently terminated on February 12, 2009. (Doc. No. 24-47, Def. Ex. 38.)

Thereafter, Benton County indicated that it was willing to consider Plaintiff for employment in another position for which she was qualified. (*Id*; Doc. No. 44-49, Def. Ex. 40.) For example, Miller was notified that she could take the Minnesota Merit

8

System Test for a financial position that had become available, but she cited her condition as preventing her from taking the test. (Def. Ex. 40.)

Miller applied for PERA disability on March 7, 2009, and Social Security Disability on April 29, 2009. (Doc. Nos. 24-50, 24-51, Def. Exs. 41, 42.) Both applications were granted. Miller filed the present action on July 26, 2011. In her Complaint, Miller alleges causes of action under the Americans with Disabilities Act ("ADA"), the Minnesota Human Rights Act ("MHRA"), and the Rehabilitation Act, as well as a cause of action for retaliation.

## DISCUSSION

### I. Legal Standard

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996). However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in

the record that create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment "may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## II. Disability Discrimination

Miller's central claim is that Defendants discriminated against her by failing to accommodate her disability. Both the ADA and the MHRA prohibit employers from discriminating against qualified individuals on the basis of disability. 42 U.S.C. § 12112 (a); Minn. Stat. § 363A.08, subd. 2.[5] "Discrimination" is defined to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability" unless the employer can demonstrate that the accommodation would impose an "undue hardship." 42 U.S.C. § 12112(b)(5)(A). To establish a prima facie case of disability discrimination, a plaintiff must show that: (1) she was disabled; (2) she was qualified to perform the essential functions of the job, with or without reasonable accommodation; and (3) she suffered an adverse employment action due to his disability. *See Kallail v. Alliant Energy Corp. Servs.*, 691 F.3d 925, 930

---

[5] The Court evaluates claims under the ADA, MHRA, and the Rehabilitation Act under the same standard. *Philip v. Ford Motor Co.*, 328 F.3d 1020, 1023 n.3 (8th Cir. 2003); *Allison v. Dep't. of Corr.*, 94 F.3d 494, 497 (8th Cir. 1996).

10

(8th Cir. 2012).[6] In a failure to accommodate case, the Court applies a modified burden-shifting analysis. *See Fenney v. Dakota, Minn. & E. R.R. Co.*, 327 F.3d 707, 712 (8th Cir. 2003). In such a case, the employee must make a facial showing that she has an ADA disability and that she suffered an adverse employment action. *Id*. Then the employee must make a facial showing that she is a "qualified individual." *Id*.

### A. Disability

The term "disability" means: (1) a physical or mental impairment that substantially limits one or more major life activities; (2) a record of such impairment; or (3) being regarded as having such an impairment. 42 U.S.C. §12102(1); *see also* Minn. Stat. § 363A.03, subd. 12.[7]

Miller argues that, as a matter of law, the undisputed material facts establish that she was "disabled" and that Defendants perceived Miller as disabled. Defendants, however, assert that, as a matter of law, Plaintiff did not provide information establishing that she had a disability prior to the July 2008 Letter. Specifically, Defendants assert that the information received from Miller prior to July 2008 did not state or imply that Miller needed an accommodation other than the potential need for FMLA leave. Defendants

---

[6] There is no dispute that Miller suffered an adverse employment action.

[7] The MHRA requires only that an impairment "materially limit a major life activity." *Liljedahl v. Ryder Student Transp. Servs., Inc.*, 341 F.3d 836, 841 n.3 (8th Cir. 2003). The ADA was amended on January 1, 2009 to broaden the definition of disability. *See Nyrop v. Indep. Sch. Dist. No. 11*, 616 F.3d 728, 734 n.4 (8th Cir. 2010). Whether or not the broadened definition applies to any portion of Miller's claims does not affect the outcome of the pending motions.

further assert that Miller's MS would not qualify as a disability prior to July 2008 because Miller did not produce evidence that she was substantially limited in any major life activity prior to that time. Defendants contend that, while Johnson was aware of Miller's MS, Defendants were not aware that Miller's MS had progressed to the point where it substantially limited her in any life activity or that she needed an accommodation, until they received the July 2008 letter. Miller disagrees and argues that the undisputed facts show that Defendants knew she was disabled both before and after July 2008.

The record demonstrates that Miller was diagnosed with MS in 2002, and that Miller informed Johnson of her diagnosis shortly thereafter. In addition, the record demonstrates that Johnson informed both Miller's immediate supervisor and the Sheriff of Miller's diagnosis. Moreover, Johnson, Hackett, and at least one other co-worker (Eull) were all aware that Miller occasionally worked from the Central Control when she was experiencing an MS exacerbation. Further, it is undisputed that Defendants received Miller's July 2008 Letter, in which she formally requested an accommodation.

The Court concludes that summary judgment for either party on the issue of whether Miller was "disabled" under the relevant statutes is inappropriate on the current record. While the record establishes that Defendants knew of Miller's MS soon after Miller was diagnosed in 2002, fact issues remain as to the moment in time at which Defendants were aware that Miller's MS substantially limited any of Miller's major life activities. *See Nyrop*, 616 F.3d at 734 (explaining that a plaintiff cannot rely on the diagnosis of MS, but must show that MS is substantially limiting in a major life activity).

That question will be one for the jury. Thus, both motions for summary judgment are denied insofar as they seek judgment on the issue of whether and when Miller suffered from a "disability" within the meaning of the relevant statutes.

    B.    **Essential Functions of the Job**

The parties also dispute whether Miller was able to complete the essential functions of her position as Sergeant. To be a qualified individual under the ADA, an employee must: (1) possess the requisite skill, experience, education, and other job-related requirements for the position;[8] and (2) be able to perform the essential job functions, with or without reasonable accommodation. *Fenney*, 327 F.3d at 712. An employer bears the burden of showing that a particular function is essential. *Id*. In cases where the employee claims that she is able to perform the essential functions of the job with a reasonable accommodation, the employee must only make a facial showing that a reasonable accommodation is possible. *Id*. When the employee has made that facial showing, "[t]he burden then shifts to the employer to show that it is unable to accommodate the employee." *Id*.

Defendants assert that Miller was not qualified to perform the essential functions of her job with or without an accommodation. Specifically, Defendants point out that Miller was unable to have inmate contact on an unpredictable basis and that this was a necessary function of the job of both Sergeant and Jailer. In addition, Defendants point

---

[8]    There appears to be no dispute that Miller possessed the requisite skill, experience, and education for her position as a Detention Officer. (Johnson Dep. at 34-35.)

out that Miller had poor work attendance and that regular and reliable work attendance is a necessary element of the job. Defendants further assert that placing Miller in Central Control during MS exacerbations was not a reasonable accommodation because it would remove essential functions of the Sergeant position, such as responding to jail emergencies, interacting with inmates, correcting performance errors, and supervising employees. Finally, Defendants assert that Miller has been unable to work since January 2009, and is therefore unable to demonstrate that her requested accommodations would have enabled her to be able to perform the functions of her job.

Miller asserts that she was capable of performing the essential functions of her job with a reasonable accommodation. Indeed, Miller asserts that she *did* perform the essential functions of the Sergeant position for several years while suffering from her disability with reasonable accommodation. Specifically, Miller points to record evidence that between 2002 and 2008, she performed her job as Sergeant while also suffering from MS. Miller points out that her contemporaneous performance reviews demonstrate that Miller was meeting or exceeding her supervisor's expectations. During her deposition, Johnson testified specifically that Miller performed Sergeant tasks including the following: providing and overseeing training of subordinate staff, monitoring compliance with policies, monitoring and supervising inmates, transporting inmates, operating county vehicles, preparing paperwork, and conducting security checks. (Johnson Dep. at 45-47.) Miller also points out that during this same time period (2002-2008), she was allowed to work in the Central Control. (*Id*. at 79.) Johnson also testified that Miller was able to do "most" of her job functions until the late spring or

early summer of 2008. (*Id*. at 47.) Miller asserts that the accommodation of working from Central Control was one that had been offered to her in the past, and that the same accommodation could have been implemented in response to Miller's July 2008 request.

Based on a review of the record evidence, the Court concludes that Miller has made her facial showing required under the modified burden-shifting analysis. The record shows that Miller's performance reviews were satisfactory during her employment between 2002 and 2008. During this time period, Miller was allowed to work from Central Control when she had an MS exacerbation. This evidence, along with other record evidence, could support, but does not compel, the conclusion by a reasonable fact-finder that Miller was able to perform the essential functions of her job when allowed to work from Central Control.

### C. Reasonable Accommodation

Because Miller has made her facial showing, "[t]he burden then shifts to the employer to show that it is unable to accommodate the employee." *Fenney*, 327 F.3d at 712. Defendants strongly dispute that allowing Miller to work from Central Control as a Sergeant was reasonable. For example, Defendants submit evidence that having a Sergeant working in Central Control (or being otherwise unable to interact with inmates) during a jail emergency would hinder the response time and could endanger staff and inmates. These arguments are well-taken and may very well be persuasive before a jury. Even so, at the summary judgment stage, the evidence submitted by Defendants is not sufficient to take the issue from the jury. Instead, the Court concludes that there is a genuine issue of material fact as to whether Miller could perform the essential functions

of her job while being allowed to occasionally work in Central Control and that a reasonable juror could conclude that working from Central Control during exacerbations was a reasonable accommodation.

The Court also notes that while Defendants submit evidence that Miller had attendance problems, the record also demonstrates that Miller did not have any documented attendance problems until *after* the option of working from Central Control was eliminated. Accordingly, those attendance problems do not necessarily foreclose a finding, by a reasonable juror, that Miller was able to perform the essential functions of her job from 2002 and 2008, and that working from Central Control could have constituted a reasonable accommodation that might have prevented Miller's absences. All of these questions are for a jury to decide.

### D. Reasonable Accommodation and Interactive Process

Miller also asserts that Defendants failed to provide her reasonable accommodations through the interactive process. "To determine the appropriate reasonable accommodation it may be *necessary* for the employer to initiate an informal, interactive process with the employee with a disability in need of the accommodation." *Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 951 (8th Cir. 1999) (internal quotation marks and citation omitted). Failing to engage in such an interactive process is not per se liability, but is prima facie evidence of bad faith and of failing to provide a reasonable accommodation. *Id.* at 952.

As discussed above, there is record support that could lead a reasonable juror to conclude that Defendants knew about Miller's disability soon after her diagnosis in 2002.

In addition, the record supports Miller's contention that she triggered the interactive process when she requested an accommodation via her July 2008 Letter. Miller alleges that after she triggered the interactive process, Defendants failed to engage in a good faith effort to assist her in seeking accommodation. Defendants dispute this and contend that Miller has not put forth any evidence that an accommodation would have been found but for Defendants' lack of interaction with Miller. Miller asserts that the record demonstrates that Defendants rejected Miller's proposed accommodation (working from Central Control) and then inappropriately placed the burden on Miller to propose another accommodation. In support, Miller cites to evidence that Defendants did not have direct conversations with Miller to discuss her condition, what she was physically able or unable to do, or what accommodations might be reasonable. Based on a review of the record evidence cited by the parties, and the parties' arguments, the Court concludes that fact issues remain as to whether Defendants made a good faith effort to engage in the interactive process.[9]

---

[9] Defendants argue that they are entitled to summary judgment regarding Miller's termination because, in applying for disability benefits, Miller indicated that she was unable to work. (Doc. No. 23 at 32-34.) In support, they cite to *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999). In *Cleveland*, the Supreme Court discussed the interaction between the ADA and Social Security Disability, and noted that "despite the appearance of conflict" between the two statutes, claims under each do not inherently conflict. *Id*. at 802. This is because while the ADA defines a "qualified person" to include a person who can perform the essential functions of a job with reasonable accommodation, the Social Security Administration determines whether an individual is disabled for the purpose of disability benefits *without* taking into account the possibility of a reasonable accommodation. *Id*. at 802-03. Here, the Court is not convinced, on the

**III.     Retaliation**

"A prima facie case of unlawful retaliation requires a showing that the employee engaged in some form of protected activity, that the employee was subject to adverse employment action, and that the adverse action was causally connected to the protected activity." *Woodland v. Ryerson*, 302 F.3d 839, 845 (8th Cir. 2002). The act of requesting an accommodation is protected activity. *See Heisler v. Metro. Council*, 339 F.3d 622, 632 (8th Cir. 2003). Here, Defendants assert that Miller cannot demonstrate a causal connection between protected conduct and any adverse employment action because the Sheriff's memo, which eliminated the option of Miller working in Central Control, was sent prior to Miller's July 2008 Letter requesting an accommodation and prior to Miller filing her EEOC charge. However, the Court already determined, above, that there are fact issues regarding exactly when Miller requested an accommodation from Defendants. The Court concludes that it would be premature to grant summary judgment on Miller's retaliation claim, as the issue of causal connection is dependent, at least in part, on the jury's determination as to when Miller requested an accommodation. Therefore, the Court denies both motions for summary judgment on this claim.

---

(Footnote Continued From Previous Page)

record before it, that Miller's application for Social Security benefits necessarily conflicts with her discrimination claims for failure to accommodate.

## CONCLUSION

For the reasons discussed above, the Court concludes that fact issues remain as to all of Plaintiff's claims in this action. Thus, both Miller's and Defendants' motions for summary judgment are properly denied. The Court cautions the parties, however, and in particular Miller, that the denial of summary judgment does not necessarily suggest victory at trial. While not sufficient to warrant judgment at this stage, it appears that the evidence in the record will make recovery at trial difficult for Miller. The Court notes that it is in the best interests of the parties to negotiate a resolution to this dispute.

## ORDER

For the reasons discussed above, **IT IS HEREBY ORDERED** that:

1. Miller's Motion for Summary Judgment (Doc. No. [26]) is **DENIED**.

2. Defendants' Motion for Summary Judgment (Doc. No. [21]) is **DENIED**.

Dated: March 1, 2013
s/Donovan W. Frank
DONOVAN W. FRANK
United States District Judge